DAVID C. WALKER, BY AND THROUGH HIS GUARDIAN AD LITEM, CONRAD H. WALKER, APPELLANT, *v.* BERT BURKHAM, RESPONDENT.

No. 3525

August 21, 1950.                    222 P.2d 205.

*Royal A. Stewart,* of Reno, for Appellant.

*Kearney & Adams,* of Reno, for Respondent.

## OPINION

By the Court, HORSEY, C. J.:

On the 1st day of August, 1947, counsel for the plaintiff, in the action in the court below, filed and served plaintiff's notice of appeal to this court from the judgment rendered and entered on the certain verdict on the 3d day of February, 1947, in the Second judicial

district court of the State of Nevada, in and for the county of Washoe, in favor of the defendant and against the plaintiff; and, also, that the plaintiff has appealed from the order denying plaintiff's motion for a new trial, made and entered in the minutes of said district court on the 31st day of July, 1947.

In appellant's "Statement of Facts" in appellant's opening brief, under the caption "The Plaintiff," appellant's counsel has, in narrative form, detailed quite fully a summary of the testimony, and, in connection therewith, has referred to numerous places in the transcript of the testimony, in support of such summary (see page 1, line 18 to and including page 3, line 1, of appellant's opening brief).

Under the caption "The Defendant," such summary by counsel for appellant is on page 3, line 3, to and including page 4, line 3.

Such summary of the testimony of the plaintiff and of the defendant is as follows:

### "THE PLAINTIFF ·

"On September 15, 1943, the plaintiff, David C. Walker, was slightly over fourteen years of age, having been born on August 17, 1929, and he was at that time living with his mother and brothers at 229 Winter Street in Reno, Nevada. (Trans. p. 191). As indicated by the diagram, (Exhibit B), the street runs North and South and the plaintiff's residence was on the West side of the street. Immediately North of the residence, was a vacant lot where the plaintiff had been accustomed to playing, and North of that was a warehouse building belonging to the Consolidated Warehouse Company. There were also warehouse buildings across the street.

"The plaintiff had returned from school about 4: 00 o'clock in the afternoon of September 15, 1943, and had brought a friend with him. (Trans. p. 194). The boys had erected a small tent on the lot adjoining their residence where they habitually played, and at the time in question, other boys were playing ball in the street in

front of the residence, vacant lot and warehouse buildings. (Trans. p. 196). The plaintiff had tossed a small radio tube thoughtlessly into the street and immediately afterwards, the defendant had appeared around a corner of the warehouse building at the point marked 'C' on the diagram. The defendant walked toward and past the plaintiff, telling him to pick up the parts of the tube in the street, which he did. (Trans. p. 197). The defendant appeared to the plaintiff to be very angry and walked within ten or fifteen feet of him and on over to the plaintiff's house. (Trans. p. 197.) The plaintiff then went over and picked up the portions of the radio tube from the street and was standing in the street at the point marked 'D' on the diagram, when the defendant, returning from the house angrily started toward the plaintiff saying that he wanted to talk to him. The plaintiff became frightened and started to run in a Northerly direction on Winter Street. (Trans. p. 198.) The defendant pursued the plaintiff and caught up with him and grabbed him by the back of his shirt swinging him around at a point in the street opposite the warehouse building located on the West side of the street. This scuffle resulted in the breaking of plaintiff's glasses. The plaintiff finally broke away and ran back towards his own house. (Trans. p. 198.) As he ran down the sidewalk in a southerly direction onto his own property, the defendant still pursuing him, tripped him causing him to fall on his left arm. (Trans. pp. 199–200.) The police were subsequently summoned and he was taken to a hospital where his arm was set several times and where he remained for a total of forty-two days. (Trans. pp. 201, 202.) The defendant had not attempted to help him or do anything further but that (he) had merely walked away after he was injured. (Trans. p. 202.)

## "THE DEFENDANT

"The defendant's testimony was to the effect that he had looked to see who had thrown the glass and that the only thing he could see was the plaintiff. That he asked

the plaintiff if he had thrown the glass to which the plaintiff had answered 'Yes.' (Trans. pp. 259, 260.) That he was going over to see the mother of the plaintiff and that the plaintiff proceeded to clean the glass up. (Trans. pp. 260, 261.) That failing to find the mother of the plaintiff at home, he had retraced his steps and called to the plaintiff that he, the defendant, wanted to talk to him. That plaintiff had stopped and he had walked up to him, standing face to face and told him that these damaging actions in breaking glass in the street would have to stop. (Trans. p. 262.) The plaintiff just stood there backing away just a step or two and that when he, the defendant, mentioned to the plaintiff that he would have to talk to his mother regarding his behavior again, the plaintiff wheeled and started to run. (Trans. p. 262.) That the defendant ran after the plaintiff and caught up with him grabbing him by the back of the shirt in the door of the warehouse. (Trans. p. 262.) That he immediately released the plaintiff and after talking to him a while again, the plaintiff turned and ran again, this time in the general direction of his, the plaintiff's house. (Trans. pp. 263–265.) The defendant again pursued the plaintiff and was about six feet behind him when the plaintiff tripped and fell and that the defendant's momentum carried him over the plaintiff. (Trans. p. 287.) On cross-examination, the defendant refused to deny that he had previously testified 'that when the plaintiff got to the front of the building, and found he was not going to get in, he stopped and humped up so I would go by him and he would double back.' (Trans. pp. 281, 282.) (Thus negativing the idea that the plaintiff was on the Consolidated Warehouse property at all during the entire episode)."

Likewise, it appears only fair to present herein respondent's statement of facts in respondent's answering brief, page 1, line 10, to and including page 5, line 1:

"For the purpose of clarity, we find it necessary to make certain corrections and additions to the appellant's summaries of the testimony of the plaintiff and the

defendant. Unless otherwise specified in this brief, where we refer to the appellant we mean the boy, David Walker.

"The statement by appellant as to respondent's testimony avoids any statement as to the surrounding circumstances and the background of the incident. Since the appeal is based primarily on the admissibility of evidence concerning these matters, we respectfully submit they should be referred to in the statement of facts.

"The evidence shows that for some time prior and continuing to the time of the incident, complained of, appellant and other boys had engaged in destructive mischief on the premises of the Consolidated Warehouse Company and had constantly trespassed thereon. (Trans. 244, Folio 730; Trans. 245, Folio 733-734-735; Trans. 258, Folio 773; Trans. 273, Folio 818; Trans. 278, Folio 833-834; Trans. 289, Folio 865; Trans. 294, Folio 880-881; Trans. 299, Folio 895, 896; Trans. 301, Folio 903; Trans. 304, Folio 911; Trans. 305, Folio 915; Trans. 309, Folio 926, 927.)

"On the day in question, in order to avoid talking with the respondent, appellant was trying to run into the same warehouse into which he had gone several times before. On several previous occasions, he had refused to leave, although requested to do so by the respondent and other employees. (Trans. 244, Folio 730; Trans. 250, Folio 748, 749; Trans. 254, Folio 760; Trans. 298, Folio 893; Trans. 299, Folio 896, 897; Trans. 301, Folio 902.)

"Appellant had on previous occasions gone across the street and south-east from that warehouse and climbed up on other warehouse buildings of the company by means of the wall adjoining the Devincenzi property. (Trans. 254, Folio 760; Trans. 289, Folio 867.)

"The respondent had talked to the appellant on various occasions in a friendly manner, offering no violence for the continued trespasses, but, although requested not to, the appellant persisted in his trespasses. (Trans. 250, Folio 748, 749; Trans. 253, Folio 757-9; Trans. 254,

Folio 761; Trans. 255, Folio 765; Trans. 256, Folio 766–7; Trans. 289, Folio 867; Trans. 293, Folio 879; Trans. 294, Folio 880, 881; Trans. 298, Folio 894; Trans. 299, Folio 895, 896; Trans. 300, Folio 898; Trans. 305, Folio 915; Trans. 306, Folio 918; Trans. 307, Folio 920.)

"The police had been called on several occasions without any improvement in appellant's conduct. (Trans. 257, Folio 768, 769; Trans. 258, Folio 772.)

"The respondent was an employee of the Consolidated Warehouse Company and responsible for the buildings and their contents. (Trans. 241, Folio 721; Trans. 302, Folio 906.) Respondent testified that at the time of the incident in question, he intended to talk further with the appellant (Trans. 262, Folio 785; and see appellant's testimony, Trans. 198, Folio 592) and if the appellant would not 'listen to reason' the respondent, who was then a deputy sheriff, was going to take him to the police station. (Trans. 263, Folio 785; Trans. 268, Folio 803.)

"On the day in question, appellant, who was on a vacant lot belonging to respondent's employer, threw glass into the street, the glass landing at respondent's feet. The respondent directed appellant to pick up the glass, which he did. (Trans. 156–7, Folio 780–781.) Respondent then walked near to, and past appellant to see if the latter's mother was at home. She was not, so respondent walked over to appellant and said he wanted to talk to him. (Trans. 262, Folio 785; Trans. 198, Folio 593.) Whereupon appellant ran to the open door of the warehouse. Respondent ran after him and caught him as he was entering. (Trans. 262, Folio 785.) Respondent made no attempt to harm appellant, but released him and attempted to talk to him. (Trans. 263, Folio 787.) When told that if his behavior did not improve respondent would take him to the police station, appellant again turned and ran off. (Trans. 263, Folio 789.) Respondent then gave chase to prevent appellant from circling onto another part of the premises, as he had done in the past, and to take him to the police

station, if Mrs. Walker was not at home. (Trans. 268, Folio 803.)

"It appears from the evidence that the appellant fell in a narrow area between a bushy tree and a fence with a depression between the fence and sidewalk. Gravel had been placed on the area nearby the Walker's home. (Trans. 292, Folio 876; Trans. 142, Folio 425; Trans. 143, Folio 429; Trans. 144, Folio 430–31). Respondent testified that appellant, while running, looked over his shoulder, stumbled, and fell. (Trans. 265, Folio 795; Trans. 266, Folio 797.) Appellant testified that he was tripped. (Trans. 199, Folio 597.)

"Not knowing that appellant was actually injured, respondent tried to help him up, but the appellant resisting and crying, respondent again went to see if Mrs. Walker was home. She was not, and respondent left. (Trans. 269, Folio 805.)

"The appellant's arm was broken when he fell. It was promptly set and placed in a cast. About two and a half weeks later the cast broke, resulting in the necessity to re-set the arm by an open reduction. Appellant testified that he did not know when or how the arm was broken the second time. (Trans. 205, Folio 614; Trans. 206, Folio 617; Trans. 216, Folio 646.) The doctor did not know what caused the second break. (Trans. 177, Folio 529.) The respondent showed that appellant was very active during the period between the breaks, engaging in activities such as might cause a second break. (Trans. 245, Folio 733–4; Trans. 290, Folio 868; Trans. 307, Folio 920.)

"Counsel for appellant states that both versions of the incident are quite similar. (Appellant's Opening Brief, p. 1, 1. 15.) He further states that respondent refused to deny his previous testimony relative to the incident. '(Thus negativing the idea that the plaintiff was on the Consolidated Warehouse property at all during the entire episode.)' We disagree with both of these statements. However, inasmuch as this appeal is based solely upon questions of law and not of fact, nor upon the credibility

of witnesses, we do not deem it necessary to point out in the respondent's 'Statement of Facts' where the discrepancies lie."

Predicated upon the facts which were, in the second amended complaint, alleged by the plaintiff, David C. Walker, it appears that, briefly stated, the alleged first cause of action was one for assault; that the minor, David C. Walker, was, on or about the 15th day of September, 1943, about fourteen years of age; that he resided with his family at 229 Winter Street, Reno, Nevada; that he was then playing in front of his home at that place; that, at such time and place, the defendant shouted at plaintiff, advanced upon him in an angry and threatening manner with intent to commit a trespass upon the person of plaintiff; that defendant was a large and virile man, fully capable of injuring plaintiff, and that plaintiff was placed in immediate and mortal fear and apprehension of an immediate physical injury to his person at the hands of defendant; that the plaintiff David C. Walker, ran away from the defendant, and that defendant wrongfully pursued the plaintiff, and ran after the plaintiff, to the fright and terror of the plaintiff, David C. Walker; and it further appeared that, solely as a result of the wrongful action on the part of defendant, plaintiff fell upon the ground with great force and violence, breaking his arm and breaking his eyeglasses; that a surgical operation upon plaintiff's arm was necessary for the purpose of setting the bone in plaintiff's arm, and that plaintiff was disabled and hospitalized for a long period of time, and that plaintiff suffered great bodily pain, great distress of body and mind, suffering distress and discomfort to the damage of plaintiff in the sum of six thousand five hundred ($6,500) dollars; and that by reason of the premises aforesaid, plaintiff was and will be permanently injured, disabled, scarred, and his body rendered unsightly, to the damage of plaintiff in the sum of five thousand ($5,000) dollars.

The plaintiff's second cause of action against the

defendant, Burkham, contained a repetition of the allegations of the first cause of action, including the alleged damages, and, in addition thereto, an allegation "that the defendant did then and there, wilfully and unlawfully and maliciously beat, strike and trip the plaintiff David C. Walker, and that the defendant did then and there at the time aforesaid lay violent hands upon the person of the plaintiff David C. Walker, and that the defendant did then and there at the time aforesaid break the plaintiff's eyeglasses and break the plaintiff's arm." By such additional allegations the purpose was, of course, to state sufficient facts to constitute a cause of action for assault and battery.

The defendant's answer to the amended complaint was demurred to by plaintiff, and a motion to strike granted on behalf of plaintiff, for the reasons that certain of the allegations of the defendant's answer contained alleged facts as having occurred at some time prior to or previous to the occurrences of September 15, 1943, "and particularly during the three weeks immediately preceding said date."

Necessarily, the defendant, in formulating, serving and filing his second amended answer, August 13, 1946, obviously confined the allegations of his fourth affirmative defense therein to the time thereof as being "on or about September 15, 1943." In that connection, the defendant, on the third and fourth pages of said second amended answer, alleged:

"1. That on or about September 15, 1943, the plaintiff was committing depredations and trespassing upon the property of Consolidated Warehouse Company, a corporation, on Winter Street, Reno, Nevada; that among defendant's duties he is charged with the responsibility for the safekeeping and protection of said property which consists of a mill, elevator, and warehouse in which there is situated equipment, goods, wares and merchandise; that plaintiff's trespasses and depredations upon said property were continuous down to and

including September 15, 1943; that said depredations and trespasses were without the permission of said Company or defendant; that said depredations consisted of disturbing and tearing down piles of goods, wares, and merchandise stacked in said warehouse; smoking and leaving burning cigarettes near inflammable material in said warehouse; breaking windows in said buildings, and destroying sacks containing grain and feedstuffs; that immediately prior to the time when plaintiff ran away from defendant as hereinabove admitted, the defendant warned plaintiff to desist from such continuing and continued depredations and trespasses upon said property.

"2. That the plaintiff scoffed at defendant's admonitions and warnings to cease and desist from further trespassing and used provocative and insulting language directed toward defendant; that for the purpose of taking plaintiff into custody for the commission of misdemeanors committed in defendant's presence, and to try to dissuade plaintiff from continuing his continued trespassing as aforesaid, defendant proceeded toward plaintiff for such purpose and plaintiff ran away from defendant, and while so running away plaintiff stumbled and fell. And if the plaintiff was injured at said time' his injury was the result of his own conduct and an accident caused by his own carelessness in failing to look where he was running." (Trans. p. 71, folio 21, to and including p. 72, folio 214.)

Subsequently, commencing on January 29, 1947, and continuing to and including February 1, 1947, the trial was had. When cross-examination was reached, many questions were propounded by counsel for defendant, Burkham, eliciting facts, and seeking to have them introduced, which were predicated upon acts, occurrences or conduct which transpired prior to the actual facts and circumstances which took place as between David C. Walker, the plaintiff, and Bert Burkham, the defendant, on or about September 15, 1943. This was doubtless

upon the theory that, as contended by the defendant's counsel, the plaintiff's alleged mischievous acts, depredations, trespasses and conduct were frequent, numerous and continuing, and that, in view of what amounted to various and repeated provocations, considerable latitude should be permitted, upon the theory that same would not be beyond the proper construction or interpretation of the phrase "on or about," and, particularly, the word "about." Due to that view, which is quite understandable under the circumstances, the defendant's counsel repeatedly, persistently and assiduously insisted, and often succeeded, in having the plaintiff's objections overruled, and the alleged irrelevant testimony admitted. Sometimes such evidence was allowed admission because of plaintiff not objecting until the particular question had been asked and answered, and no motion made in order that same might be stricken, so that the objection of plaintiff's counsel might have been entertained. Much more frequently, however, facts or circumstances were allowed admission in the record, apparently because of the theory that the term "about" was sufficiently "elastic" to justify the overruling of the particular objection to the effect that the fact comprehended in the testimony was irrelevant and immaterial.

Just as earnestly, diligently and ably, plaintiff's counsel most strongly and repeatedly objected to permitting the admission of evidence which was not relevant to the actual facts and circumstances which constituted the basis for the cause of action involved in the instant case.

Undoubtedly, from having read fully the transcript of the testimony, it is clearly apparent that many extrinsic items of evidence which did not enter into the issues properly constituting the cause of action for assault, or assault and battery, were admitted, and, most likely, were given effect by the jurors hearing the case. Consequently, appellant's counsel, doubtless, has felt impelled to present to the court his assignment or specification of error No. I. Such specification of error No. I is stated by

appellant as follows: "The Court erred in improperly admitting evidence prejudicial to the plaintiff over the objection of the plaintiff of alleged provocative acts and conduct of the plaintiff prior to September 15, 1943."

Mention has been made above of the phrase "on or about." In 29 Words and Phrases, Perm.Ed., p. 455, is the following:

"The expression 'on or about,' in instruction, does not mean a variation of three or four months. Render v. Commonwealth, 206 Ky. 1, 266 S.W. 914, 916.

"The words 'on' or 'about' have a broader meaning than 'upon'; the words 'on' or 'upon' signify closer contact. Commonwealth v. Lanzetti, 97 Pa.Super. 126."

Particularly significant is the clearly expressed limitation confining the phrase within a very narrow scope, viz.:

"An admission that a notice was served 'on or about' June 16, 1906, cannot be construed as an admission that the notice was served June 15th *or prior thereto*. Hope v. Scranton & Lehigh Coal Co., 120 App.Div. 595, 105 N.Y.S. 372, 378. (Italics supplied.)

"The common understanding of the words 'on or about' when used in connection with a definite point of time is, that they do not put the time at large, but indicate that it is stated with approximate certainty. Parker v. State, 63 Ind.App. 671, 113 N.E. 763, 764. * * *

"Finding that building was completed 'on or about October 26th' is sufficiently definite, in view of record, admission that such was the date; 'on or about' meaning the day mentioned or one in close proximity thereto; *One or two days either before or after* being implied. Boscus v. Waldmann, 31 Cal.App. 245, 160 P. 180, 186." (Italics supplied.)

And in 29 Words and Phrases on page 457 is the following:

"Where an information in a prosecution for murder alleged that on or about a certain time the murder was committed, the words 'or about' should be treated as without meaning and as surplusage, and hence 'on or about' August 11; 1882, should be construed to mean

*August 11, 1882,* and was sufficiently definite. State v. Harp, 31 Kan. 496, 3 P. 432, 433." (Italics supplied.)

In certain cases, particularly when circumstantial evidence is involved, the pleader may not at that time know with certainty the precise time in which an act may have occurred, and, following the common form as to the phrase "on or about," finds it convenient to employ same. But in the instant case, in which the assault by Burkham upon the person of the boy, David C. Walker, was involved, the parties, and all persons directly involved, knew, or soon thereafter ascertained, that all of the facts constituting what was later determined to be the cause of action actually occurred on the 15th day of September, 1943. And when all of the parties knew such facts, it was proper for counsel for the plaintiff to insist, before opposing counsel and the trial court, upon the following contended interpretation, to wit: "I object to the question again. It is irrelevant and immaterial unless limited to the time when the occurrence in question arose on September 15, 1943, at or about five or six P. M." (See page 5 of appellant's reply brief.)

On the preceding page 3, to and including page 5, in appellant's reply brief, is the following:

"With reference to the contention that no objection was made to the introduction of testimony of the alleged prior acts or, if made, such objection was general as opposed to a specific objection which did not properly inform the Court or counsel as to the reasons for the objection:

"From the time of the commencement of the action, there had been a tenacious attempt on the part of the respondent to plead and to bring into evidence matters and things which were highly prejudicial to the plaintiff and which had no relation to the occurrences of September 15th, 1943:

"(See Transcript Page 35—Defendant's Answer)

" 'That on September 15, 1943, *and for more than a year prior* thereto * * *'. (Italics supplied.)

" 'That for some time *previous* to September 15, 1943,

and particularly during the *three weeks immediately preceding* said date, Plaintiff, David C. Walker, had repeatedly and with full knowledge of the wrongfulness of his acts, trespassed without permission, authority or right * * *'. (Italics supplied.)

"And also the following on Transcript Page 37:

" 'That on several occasions shortly prior to said date and with full knowledge of the wrongfulness of his acts, Plaintiff, David C. Walker, had committed misdemeanors in the presence of Defendant and had maliciously and wilfully disturbed the peace and quiet of the neighborhood * * *'.

"The appellant had just as strenuously urged the elimination of those matters occurring prior to September 15th, 1943:

("See Motion to Strike—Transcript Pages 42–43; Motion to Make More Definite and Certain by requiring the defendant to allege the date of the last trespass previous to September 15th, 1943—Transcript Page 44—which Demurrer and Motion to Strike were granted by the Court—Transcript Page 60.)

"The Court therefore having ruled as a matter of pleading that the respondent could not plead and allege matters and things which occurred prior to September 15th, 1943, the respondent in his amended answer to plaintiff's second amended complaint pleaded that the matters and things, which he had previously alleged occurred prior to September 15th, occurred on or about September 15th, 1943.

"The foregoing is set forth to show the actual situation as it existed at the time of the trial, with respect to the propriety of the introduction in evidence of matters occurring sometime prior to September 15, 1943, and being highly prejudicial in their nature to the plaintiff, which resulted in the plaintiff being placed on the horns of the dilemma as to whether he would aggressively defend himself against the charges leveled at him by his assailant and which occurred as much as two years before, or whether he would continue to try his own case

and avoid being led down the intriguing path prepared by his assailant.

"The reason for requiring any objection to be specific in its nature is to allow opposing counsel to know the precise point of the objection so that the question may either be reframed or the proper foundation laid for the admissibility of the testimony.

"Here certainly neither counsel nor the Court was in any way misled by the objections of counsel for the appellant for the reason that the respondent had already attempted to plead the very matters, the introduction of which counsel objected to, and the Court had already ruled that as a matter of law that such matters could not be considered.

"The appellant believes that the respondent's first objection then can be disposed of by an examination of the objection made itself and the authorities cited by the respondent. The objection as set forth on Page 6 of respondent's brief is as follows:

" 'I object to the question again. It is irrelevant and immaterial unless limited to the time when the occurrence in question arose on September 15, 1943, at or about five or six P.M.' "

Much as we dislike unduly to extend this opinion, it seems conducive to a clear understanding of such ruling as we shall make as to specification of error No. I, that further detail is essential as to just what occurred before the court below as to the admission or rejection of the many alleged "provocative" acts and conduct of the plaintiff prior to September 15, 1943. On page 7, line 19, to and including page 9, line 5, of appellant's reply brief, is the following:

"The testimony from Page 244 to Page 254 of the transcript was all admitted over frequent objections with the definite understanding so far as the Court and counsel for the appellant was concerned that it was a mere continuation of the questioning on Transcript Page 243, wherein the Court had already ruled that the witness might tell what occurred 'on or about' September

15th, 1943, and had refused the request of the appellant to question the witness on voir dire for the purpose of definitely determining the date of the occurrences relative to which he was testifying. (Transcript Page 244.)

"See for example the question on Transcript Page 245, Folio 733:

" 'Q. Confining your statements to that period, on or about September 15, 1943, not after September 15th, what were the plaintiff's actions?'

"And the Court's statement on Transcript Page 246, Folio 737:

" 'Court: You are still confining it to on or about September 15, 1943?'

"And the statement of counsel on Transcript Page 249, Folio 744:

" 'Mr. Adams: Your Honor, I have attempted to confine all of these remarks to on or about September 15th, and I do not wish to preface each remark with that date.

" 'The Court: So the record will be clear, this type of examination will be confined to on or about September 15, 1943; is that correct, Mr. Adams?

" 'Mr. Adams: That is correct, your Honor.

" 'The Court: The objection is overruled.'

"And on Transcript Page 249, Folio 746:

" 'Q. (By Mr. Adams) Before inquiring further on that, I will ask you with reference to the damage you testified to the buildings on the east side of the street, did you, prior to the accident that the plaintiff spoke about, when he was injured, prior to that time, had you spoken to David Walker relative to his activities up there?

" 'Mr. Stewart: I object to the question on the ground it is irrelevant and immaterial.

" 'The Court: The objection is overruled. It is confined to the same time?

" 'Mr. Adams: Yes.'

"Also, Mr. Adams' statement contained in Transcript on Page 251, Folio 750:

" 'Mr. Adams: Q. You understand I am not asking

for any instances that may have happened a long time prior to this time? A. That is correct.

" 'Q. And I am confining my question to that time. A. Close to that time.

" 'Q. Yes, that is right, on or about September 15, 1943.

" 'The Court: The objection is overruled.' "

Some of the reasons which have prompted us to reach the conclusion that specification of error No. I is well taken is that it appears to us unwise to permit numerous other prior facts and circumstances, not relevant to the pleadings and the definite issues before the court, to be admitted in evidence, thereby requiring the consideration of a large number of other matters of fact and law which necessarily served to confuse the jury and probably to cause an unjust result. A "blanket" characterization, in effect, termed as provocative acts or conduct, including many different facts and circumstances, and at different times, and permitted to be admitted upon cross-examination, without prior notice to plaintiff, prevented the plaintiff from having a fair opportunity to meet such new issues and to be prepared to marshal his evidence, and to present same. Furthermore, the allowance of such irrelevant evidence constituted such a far departure from sound principle and practice as, necessarily, to have opened the way to undue multiplication of issues, not conducive either to thorough consideration of such extrinsic issues, nor to the confinement of such extraneous matters as would reasonably contribute to sound judicial economy in the administration of justice. It appears abundantly clear that specification of error No. I must be held well taken.

The second specification of error is that the trial court erred in giving instruction No. 15, to the effect that it was proper for the defendant to put the plaintiff in immediate apprehension of a harmful or offensive contact in excess of that which the defendant was lawfully entitled to actually inflict, if they found that the plaintiff was a trespasser at the time set forth in the complaint.

The respondent, as to certain of the instructions, contends that in the conference with the trial judge and respective counsel, the evening before the trial was concluded, in which there was extensive discussion as to the settlement of the proposed instructions, it was understood, and perhaps agreed, that said instructions were satisfactory, apparently, to the respective attorneys. Respondent's counsel have pointed out, as to certain instructions, particularly instruction No. 22, that appellant's counsel suggested that the word "direct," immediately before the word "consequence," be substituted instead of the words "natural and probable," clearly indicating that counsel for the appellant must reasonably be deemed to have agreed to such instruction No. 22 as thus changed. On the other hand, appellant's counsel with equal insistence, contends, in effect, that such negotiations, discussions, modifications, etc., as were formulated were, necessarily, tentative; that, notwithstanding that the presiding trial judge has, in writing, stated, in effect, that he believed the respective counsel had, on said occasion, indicated that the instructions were agreed upon and settled on said evening, that this court should, as we view the matter, take into consideration the following statement made by the trial court just prior to the trial judge's going into court, and which is as follows: "If you have any objection to the instructions, you will have the right to place the objection in the record after the matter has been submitted to the jury." Counsel on both sides, after such statement was made by the court, availed themselves, respectively, of such right, and such instructions were filed.

And it is clearly the practice in this state, in view of N.C.L.1931–1941 Supp., sec. 9931, Pocket Part, which was enacted March 5, 1945, that: "In both civil and criminal cases, exceptions to rulings or orders of the court are unnecessary, and all rulings and orders of the court are deemed excepted to."

Respondent's counsel have stated, on page 22 of respondent's answering brief, lines 18 to 28, the following:

"Instruction Number 15 contains two separate and distinct propositions: It sets forth the privilege of a person to do certain acts in the defense of his property. It sets forth the circumstances which must exist at the time of the incident before the exercise of that privilege.

"The appellant's exception to Instruction Number 15 was a general one based upon 'no evidence to substantiate such instruction.' The exception taken was to the charge as a whole. Counsel did not endeavor to point out wherein there was insufficient evidence to substantiate the instruction. Therefore, the alleged error should not be considered by this Court."

As we view the matter, it may be said as to the exception by appellant's counsel as to instruction No. 15 being too general because taken as a whole and not specifying, as respondent contends, the existence of two separate propositions, that respondent's counsel could, on the other hand, have included more than they did. Undoubtedly, the language of section 81 (vol. I), page 187, of the Restatement of the Law of Torts embodies paragraphs (1) and (2), and in view of the factual situation in the instant case and in order that the instruction No. 15 be not deemed erroneous, the doctrine or rule and the principles embodied therein should, at least in substance, have included in its appropriate phraseology both of such paragraphs (1) and (2).

Counsel for the appellant and the respondent, respectively, have, in their respective briefs, treated and considered said volume I, section 81, of the Restatement of the Law of Torts, on page 187 (and correctly so), and, after a thorough study of said paragraphs (1) and (2), it appears indispensable to the proper application of the facts and circumstances in the instant situation, that said paragraphs be treated as a whole, that is to say, treated merely as parts of an essentially entire proposition.

We shall now, to the extent which may appear necessary, consider further the instruction No. 15. One of the most important of the sections of volume I of the

Restatement of the Law of Torts is that designated as section 81, page 187, which is as follows:

"Sec. 81.   Amount of Force Permissible.

"(1)   The actor is not privileged to use any means of defending his land or chattels from intrusion which are intended or likely to cause bodily harm or confinement in excess of that which the actor correctly or reasonably believes to be necessary to prevent or terminate the other's intrusion.

"(2)   The actor is privileged in defense of his land or chattels against intrusion to do an act which is intended to put another in immediate apprehension of a harmful or offensive contact or other bodily harm or confinement which is in excess of that which the actor is privileged to inflict, if his act is intended and reasonably believed by him to be likely to do no more than to create such an apprehension.

"Comment on Subsection (1):

"a.   The Comment on Sec. 70 is equally pertinent to this Section.   The rule stated therein, that a force, though normally not excessive, may become excessive because the actor realizes or as a reasonable man should realize that under the circumstances it is likely to result .in harm to the other in excess of that which the actor is privileged intentionally to inflict, is applicable to a situation which is of frequent occurrence under the rule stated in this Section.

"Comment on Subsection (2):

"b.   One in possession of land or chattels may intentionally put another in such an apprehension of contact not threatening serious harm or death, as, but for the privilege, would be actionable, even though the harm which he causes the other to apprehend is in excess of that which he is privileged to apply.   But he may not make such a threat if he knows or should know that the circumstances are such that the other, in his effort to avoid the threatened harm, may probably sustain harm greater than the actor is privileged intentionally to inflict upon him.   Thus, while one upon whose vehicle

a boy is stealing a ride may drive him therefrom by threatening him with a whip with which he would not be privileged to beat the boy, he is not privileged to do so if the vehicle is moving at a rapid rate or amidst heavy traffic. So too, one may not by a similar means drive another from his land if the only way of escape therefrom involves danger of substantial harm. In determining whether a particular way of escape therefrom involves such a danger, account must be taken of the fact that the other may be so taken up with his efforts to escape the violence threatened by the actor as to be unable to observe perils which he otherwise would be able to avoid."

Considering the matter concretely and applying the situation to the instant case, the language of the paragraph (2) above mentioned permits one in a situation like Burkham, the respondent, in availing himself of his privilege in defense of his land or chattels against intrusion, to do an act which is intended to put another in immediate apprehension of a harmful or offensive contact or other bodily harm or confinement which is *in excess* of that which the actor is privileged to inflict, if his act is intended and reasonably believed by him to be likely to do no more than to create such an apprehension. So, such theory of *excessive* bodily harm or confinement is not to be applied actually and in fact, but merely to do no more than to create such an apprehension. In other words, it is only a "make-believe" deterrent, and is in contradistinction to the meaning of paragraph (1), in which latter paragraph one in the situation of Burkham is not privileged "to use any means of defending his land or chattels from intrusion which are intended, or likely, to cause harm or confinement in excess of that which the actor correctly or reasonably believes to be necessary *to prevent or terminate* the other's intrusion." (Italics supplied.)

Let us apply the concrete situation to Burkham and, respectively, to David Walker. Upon Burkham's returning from his going to the home of David Walker's

mother, and not finding her at home, Burkham called to the boy, David, and said he wanted to talk to him. David was playing nearby, and he responded and walked toward Burkham, and they thereupon virtually confronted each other. Burkham, according to David's testimony, "yelled" at him, and, in effect, stated to David that his damaging action in breaking glass in the street would have to stop. From the testimony of David, Burkham looked and appeared to be very angry. David thereupon started back a step or two, and started to run from Burkham. Burkham, in effect, said David was directing his course toward the warehouse. David testified that he ran north on Winter street, and was running near the alley alongside the warehouse, but had not actually started to enter. Whatever mere apprehension there was, was of short duration, and would apply to a situation such as described in said paragraph (2) of the Restatement.

From that point in the narrative, the situation became not merely one of apprehension, but of actual and physical acts and conduct as between Burkham and the boy, David Walker. It was at that point that the actual assault commenced. Burkham immediately ran after David, and, running swiftly, overtook him at the entrance of or inside, the warehouse. The testimony is uncertain as to that phase of the factual situation. Burkham, at the trial, said he had run around David, and, in effect, had blocked him and prevented his getting farther inside the warehouse, but indicated that David *was* inside. In certain earlier proceedings before Judge Maestretti, it appeared from the testimony of Burkham that he was not certain whether David was actually inside the warehouse upon the occasion mentioned. And David testified, in effect, that he was running past the alley and near the entrance, but not inside, when Burkham stopped him. That fact, however, seems quite immaterial. All of these matters were of such nature as to make applicable to concrete facts, such as were then occurring as between Burkham and David, a factual

situation such as is described in the language designated as paragraph (1) of section 81, of said volume I of the Restatement of the Law of Torts, and not as described in paragraph (2) thereof, dealing merely with the term "apprehension." And in instruction No. 15, as before indicated, only such facts as were applicable to the doctrine of said paragraph (2) of the Restatement were embodied in that instruction, and the facts (now described in this opinion) which were applicable properly only to the doctrine of said paragraph (1) were omitted in such instruction No. 15.

It seems somewhat surprising, viewing the matter from a legal point of view, why Burkham became so perturbed, agitated and perhaps angered just before and at the time he, Burkham, called to David when the latter was playing. In the past, David and other boys had doubtless been annoying, as boys sometimes are, but on this particular occasion, in tossing the glass tube in the street, and which apparently had inadvertently hit Burkham, shattering the glass at his feet, there appeared no indication of any substantial injury to Burkham. And David, immediately after Burkham had told him to do so, had picked up the broken glass particles from the street and thrown them on a vacant lot, where rocks, rubbish, etc., were deposited. From Burkham's commanding expression and apparent anger, one may speculate as to whether the attitude and actions of Burkham were reasonable, or whether they were retaliatory, and whether or not personal dislike or revenge may have entered. Burkham, upon accosting David near or at the warehouse, "grabbed" David and turned him around, so Burkham would be farther inside the warehouse than David, and confronting him. It was then that Burkham employed such physical force not only to turn David around, but also to tear his shirt, and perhaps, too, it was then that David's glasses were broken. It may naturally be wondered as to whether or not Burkham's angry attitude, his pursuit of David amounting to assault,

with the means at hand of violently assaulting him, and his attitude in committing a harmful contact or battery upon him, in which he pulled David around and tore his shirt, was because of such angry, hostile or malicious attitude on the part of Burkham, and which may, perhaps, have been due to human frailty on Burkham's part, in resenting to too great an extent a boyish prank or pranks, or mischievous conduct, or whether or not same was solely due to the force employed by Burkham to prevent this particular indication of probable or possible intrusion or trespass upon the warehouse property.

Reference is made to the case of Curlee v. Scales, of the Supreme Court of North Carolina, 200 N.C. 612, 158 S.E. 89, in which, in the syllabus, it is stated:

"One in possession of property has right to protect it against aggression, using force reasonably necessary, except that human life must not be endangered or great bodily harm inflicted.

"Question of excessive force in defense of property is for jury."

In view of the verdict of the jury in the instant case, and bearing in mind the reasoning embodied in the principles of paragraph (1) of sec. 81 of the Restatement, upon the subject "Amount of Force Permissible," on page 187, and in which it is stated that excessive force must not be used, and that such force is excessive if great bodily injury is inflicted, but may not be excessive, even though bodily harmful, if the actor reasonably believed the course employed was reasonably necessary to prevent or terminate the other's intrusion, it would appear to us, under all the circumstances, that such assault or assault and battery as to the force employed in regard to the occurrence at or in the warehouse should not have been deemed excessive. And doubtless the jury so found, if they expressly considered that phase of the matter.

What followed immediately after the episode at the warehouse? Burkham at that time said to David that

David's behavior must improve, that he, Burkham, would call to see David's mother, and also mentioned something as to taking David to the police station, apparently in the event that such conditions were not met. Immediately, David sort of "slumped" down and ran entirely away from the warehouse and from the premises, and unlike "the Arab who folded his tent and silently stole away," David acted more as described by appellant's counsel on page 22 of appellant's reply brief, that he was "scampering away as fast as his legs would carry him."

Again, Burkham immediately resumed running after David, but this time, instead of running "to prevent or terminate the other's intrusion," did just the opposite. It is difficult to determine why there was any need at all, or any justification, for Burkham, upon the intrusion having completely terminated, to have renewed the former assault with the offer and means of violence indicated, as he had done before when probable intrusion upon the warehouse premises was imminent. Burkham rather weakly asserted, as indicated by the record, that he expected David "to circle back again toward the warehouse," but such assertion on Burkham's part was not evidence, but purely speculation, that is, a mere "guess" on his part.

Why did Burkham find it necessary to apprehend David when the latter was fleeing to his mother's premises, and to assume "dominion" over him, in order to take him before his mother? Burkham could, when the mother returned home, then, or at another time, have peacefully and without the assertion of any force and probably with the mother's request to David, have informally arranged for a conference or discussion as to taking steps to "improve David's behavior," and to prevent any recurrence of "depredations" of which Burkham so bitterly complained. Such would have been, it is believed, the better course, and same doubtless would have been followed had not anger, or at least had not temper and provocation, been permitted to enter into Burkham's then mental attitude. Probably, too, by

a different conception and by other methods much more could have been accomplished. Much harm, under varying facts and circumstances and which involve serious physical injury and mental distress respecting persons directly or indirectly involved, in their acts and relations, often-times results from a person "taking the law into his own hands."

It is not advisable, we believe, to determine certain other defensive matters concerning the case, but such matters may well be left to the trial court and jury to decide at a new trial. Other questions, such as intent and/or malice, under certain circumstances, and, perhaps, other possible matters of a defensive character, are not within the scope of instruction No. 15, nor of specification of error No. II.

Referring again to instruction No. 15, it is apparent that the principles and legal factors embodied in paragraph (1) of said sec. 81 of vol. I of the Restatement of the Law of Torts, page 187, were not included in said instruction No. 15, in view of what we have just been dealing with as to the factor or element in said paragraph (1) as to "terminating the other's intrusion," and which, in view of the developments in the case, was of the very essence of the cause of action, and was not mentioned in instruction No. 15, nor were other important and essential elements included therein.

Instruction No. 15 is based only upon the proposition of "apprehension," and its accompanying language was misleading and calculated to divert the attention of the court and of the jurors from the substantial principles and factors embodied in paragraph (1) of said sec. 81, vol. I, of the Restatement, as applied to the essential factual situation. Therefore, the instruction No. 15, which did not apply to any important principle applicable to the concrete facts or law involved in the present issues in the instant case, was, in large part if not entirely, academic and moot, and cannot properly be approved by this court. The specification of error No. II, therefore, is well taken.

Referring to the specification of error No. III, that the trial court erred in giving instruction No. 22, it does not appear necessary, in treating this specification of error, to do more than refer to a number of the authorities, as we feel convinced that the principles set forth in such authorities are correct.

In relation to chapter 11 of the Restatement of the Law of Torts, vol. 1, on pages 681–683, under the subject, "Causal Relation Necessary to Liability for Intentional Invasions of Interests of Personality, Land and Chattels," in sec. 279, it is stated: "If the actor's conduct is intended by him to bring about bodily harm to another which the actor is not privileged to inflict, it is the legal cause of any bodily harm of the type intended by him which it is a substantial factor in bringing about."

Under paragraphs "a," "b" and "c" of "Comment," on said pages 681–683, is much illustrative material supporting the text.

And the opinion in the case of Eastern Texas Electric Co. v. Baker, Tex.Civ.App., 238 S.W. 335, we believe, sufficiently and clearly discusses the rule properly. We have referred to the opinion, and will quote from the syllabus, in 238 S.W. on page 336, as follows: "In an action for willful, aggravated assault and battery, proximate cause is not an issue requiring instruction to jury, and the perpetrator of the act is presumed to have intended the consequences."

For the reasons indicated, the specification of error No. III is well taken.

In specification of error No. IV it is stated that: "The Court erred in admitting testimony of the defendant, Bert Burkham, that the plaintiff had trespassed upon the property and committed depredations to the property of the Consolidated Warehouse after September 15, 1943, and after the time of the alleged assault, and that the plaintiff had crawled over the fence into the Consolidated Warehouse property and started pounding on an automobile with a pipe."

It appears reasonably clear that in his testimony Burkham, the respondent, testified, in effect, that at least several days after September 15, 1943, it not appearing with any certainty how many days thereafter, the plaintiff, David Walker, had trespassed as above indicated. As we view the matter, these alleged facts were not within the issues. As fully treated in connection with the specification of error No. I, the facts involved occurred neither "on" nor "about" September 15, 1943, and, consequently, were not within the pleadings.

Furthermore, even if we could properly find that the acts or conduct which occurred subsequent to the facts and circumstances constituting the cause of action might be relevant to affect the extent of damages, or to mitigate same, because of some act or conduct of the plaintiff which it is contended, in effect, by respondent, might have caused *further* damages for which he, rather than Burkham, may have been legally responsible, there appears no sufficient reason, under the *pleadings*, whereby same could have been properly considered.

Even if, under certain exceptional circumstances which may have occurred after September 15, 1943, the evidence could have been considered relevant, on the point in question as to whether or not, due to lack of proper care of the plaintiff's injured arm, further injury was caused by reason of his own negligence, to the extent that the amount of damages might be apportioned or mitigated, such evidence, we believe, could not properly have been considered in the absence of some further additional pleading.

In view of the situation as same now appears in the record, the specification of error No. IV is well taken.

For the reasons fully set forth above, it is ordered that the judgment and the denial by the district court of plaintiff's motion for a new trial be, and they hereby are, reversed.

BADT and EATHER, Justices (concurring specially).

We concur in the order reversing the judgment and

in the order reversing the denial of appellant's motion for a new trial and remanding the case to the district court for a new trial. However, as such concurrence is based entirely upon the appellant's third assignment of error and as the opinion of the chief justice finds such reversal necessary by reason of all four of appellant's assignments of error, we find it necessary to set forth our views as briefly as may be.

The foregoing opinion correctly analyzes the complaint as containing two causes of action—the first being for unlawful assault and the second for unlawful assault and battery, both being alleged to be wilful and malicious. This analysis coincides in turn with the two separate episodes of September 15, 1943. The first of these episodes, namely, defendant's pursuit of plaintiff as the latter was running towards the warehouse door and defendant's overtaking of the plaintiff at the door and his catching of the plaintiff by the shirt, being the first episode and the basis of the cause of action for assault and battery. This episode, accepting the jury's version of the case, was the only one in which defendant made any bodily contact with the plaintiff. The second episode was defendant's pursuit of plaintiff when the latter was entirely off the defendant's premises and even off the street fronting the defendant's premises and was running away towards his own house pursued by defendant.

■ I. Appellant's first assignment of error goes to the admissibility of evidence adduced by respondent both in cross-examination of the plaintiff and through respondent's own witnesses concerning prior intrusions and trespasses on the part of plaintiff. We are unable to agree that the admission of such evidence was error, with particular reference to the first episode and the cause of action for assault and battery. Indeed, the foregoing opinion of the chief justice recognizes that "in view of the verdict of the jury in the instant case" and the rule that force "may not be excessive, even though bodily harmful, if the actor reasonably believed

the course employed was reasonably necessary to prevent or terminate the other's intrusion," the assault and battery and the force employed at the warehouse could not be deemed excessive, "and doubtless the jury so found * * *." The reasonableness of the force there employed would, it would seem to us, depend upon the defendant's experience with the previous trespasses of the plaintiff. This has been most clearly expressed in the case of Bunten v. Davis, 82 N.H. 304, 133 A. 16, 18, 45 A.L.R. 1409. In that case the defendants discharged rifle shots against plaintiff's automobile and sought to justify their conduct on the ground that they were defending their premises from unwarranted intrusion by the plaintiff and his companions. Plaintiff on the 4th of July was taking five young men for a ride in his car. As they passed defendants' house both defendants were beside the road with a flashlight and gun. After passing the house some of the young men exploded dynamite. The car turned back and some one exploded more dynamite. The car then turned into the defendants' premises and at her command her son fired at the car. The defendants, as grounds for their fear of damage to their property, offered to show previous experiences on like occasions. They were allowed to show all that occurred on the night in question but the rest of the offered evidence, including evidence of a like occurrence two years before, was excluded as being too remote. In reversing the judgment for the erroneous exclusion of such evidence, the court said:

"The defendant had the right to make reasonable defense of her property against invasion. * * * In the determination of the issue thus presented, the defendant's knowledge of facts bearing upon the situation are to be taken into consideration. While the standard of conduct is external, the actor's knowledge is included with other facts in ascertaining the reasonableness of the course pursued. * * *

"The nature of the defense is such that more is involved than merely the defendant's state of mind. In order to

make good the defense set up it was necessary that it be made to appear, not only that the defendant entertained certain apprehensions, but also that her knowledge justified her state of mind and the conduct induced thereby. The jury were to be the judges, not only of her belief, but also of the reasonableness of her belief and conduct. To deal with these propositions, it was essential that they be put in her place and supplied with all the facts which she had to consider. Her acts were to be judged in the light of all the circumstances which existed and were likely to influence conduct. (Citing authorities.) * * *

"Unless it could be concluded, as matter of law that the defendant's former experience could not be found to furnish a justification or legal excuse for her conduct, she was entitled to put that experience before the jury. If justification might be found therefrom, it was her legal right to introduce the facts in evidence. * * * When the issue is the reasonableness of conduct, a narrow limit cannot be put upon the scope of the inquiry into the knowledge and experience of the actor.

"The issue of reasonable conduct is not usually proved by direct testimony to that end. It is a conclusion to be drawn by the trier of the fact from other facts that are put before him for his consideration. The appeal is to 'the judgment and experience of the jury.' * * * Hence it follows that all the surrounding circumstances become facts material to the case, as distinguished from circumstantial evidence from which a conclusion as to the existence of such facts is sought to be drawn. They are circumstances in proof, but they are not circumstantial evidence. * * *

"The mere fact that some of the occurrences offered in proof happened two years before the time in question did not make them remote. In view of the peculiar nature of the transactions involved, they were immediate. * * * Remoteness is a relative proposition. Time and space are only parts of the element to be considered."

The respondent cites other authorities to like effect but we believe the foregoing case to be so well reasoned (see entire opinion) and so applicable in its facts to the first episode in this case that discussion of other authorities is not warranted. Appellant relies strongly upon the annotation in 63 A.L.R. 890 and states that it there appears that in 22 of the 33 jurisdictions that have considered the point it was held that evidence of prior trespasses on the part of the plaintiff was not admissible. It should be noted, however, that this annotation has to do entirely with the question of the admissibility of such evidence in mitigation of compensatory damages and does not deal with such evidence as justification for the defendant's act or the reasonableness thereof. With all due respect to the foregoing opinion we cannot agree that the admission of the evidence in question, particularly as it applied to the first episode, the cause of action for assault and battery, was erroneous.

II.  The second specification of error attacks instruction No. 15.  The opinion of the chief justice in upholding this assignment of error does not quote the instruction, which reads as follows:

"You are instructed that a person has the right to defend his land and chattels against trespass or intrusion and in so doing has the right to do such acts and things as are intended to put the trespasser or intruder in immediate apprehension of a harmful or offensive contact or other bodily harm or confinement which is or may be in excess of that which he is lawfully entitled to actually inflict, provided his act is intended and reasonably believed by him to be likely to do no more than to create such apprehension in the mind of the trespasser or intruder.

"Therefore, if you find from a preponderance of the evidence, as herein defined, that the plaintiff was such a trespasser or intruder at the time set forth in the complaint and that the acts of the defendant were intended and reasonably believed by the defendant to be likely to

do no more than to create such apprehension in the mind of the plaintiff, and if you further find from a preponderance of the evidence that while under such apprehension the plaintiff fell and injured himself in running from the defendant at the time alleged in the complaint, the defendant is not liable and your verdict should be for the defendant."

The reason assigned by the chief justice for holding this instruction bad, is that it covers only the second episode, the defendant's pursuit of the plaintiff when the latter was fleeing from the premises and when no steps or acts were required on the part of the defendant to prevent or terminate a trespass or intrusion. In our opinion, however, the first episode was covered by instruction No. 16, reading as follows: "You are instructed that to use or attempt to use force or violence upon or towards the person of another is not unlawful, when committed by a person preventing or attempting to prevent a trespass or other unlawful interference with real or personal property in his lawful possession, provided the force or violence used is not more than sufficient to prevent such offense, or more than seemed to a reasonable man under the circumstances to be necessary."

The converse of this proposition would seem to be self-evident, namely, that if the force or violence used was not for the purpose of preventing a trespass, or was more than sufficient to prevent the trespass or more than would appear necessary under the circumstances to a reasonable man, the use of such excessive force would be unlawful. In any event no error was assigned for any alleged refusal by the trial court to give such converse instruction. Hence instruction No. 15, even assuming that it applied only to the second episode, was not erroneous. It should be emphasized that instruction No. 15 contains important language not quoted in the opinion of the chief justice, namely, that in defining the right of the owner of the premises to put the trespasser or intruder in immediate apprehension of a harmful or

offensive contact, the same is restricted to the right of a person "to defend his lands and chattels against trespass or intrusion." Under this instruction plaintiff's counsel had the right to argue to the jury, and undoubtedly did so, that under the second episode the defendant was not engaged in defending the property from intrusion. We think the instruction was proper and in complete accordance with the rule stated in the Restatement of the Law.

■ III. We are in accord with the conclusion reached by the chief justice that the giving of instruction No. 22 was error. This instruction likewise is not quoted in full in the foregoing opinion and we find it necessary to set it forth. It is as follows: "You are instructed that the proximate cause of an injury as the term is used in this charge, in its legal signification is a cause which in its natural and continuous sequence, unbroken by any new cause, produces an event, and without which the event would not have occurred, but in order to warrant a finding that any act of defendant is the proximate cause of an alleged injury, it must appear from the preponderance of the evidence as herein defined that the injury, if any is found, was the direct consequence of such act."

Proximate cause had no place in the case and it was error to instruct the jury that to find for the plaintiff it must appear that the injury was the direct consequence of defendant's act. The jury had the right to find that defendant's pursuit of the plaintiff when the latter was off of and fleeing from the defendant's property, had no relation to any attempt to prevent or terminate a trespass or intrusion, or a threatened or attempted trespass or intrusion, and that the defendant's pursuit of the plaintiff was therefore wrongful and unlawful. Under these circumstances the jury had the further right to find that by reason of such unlawful pursuit and by reason of defendant's anger and threatening demeanor the plaintiff was put in such fear that he could not be reasonably expected to avoid even such

ordinary danger involved in his flight. Under these circumstances, under which the defendant would not be privileged, the injury would not have to be the direct consequence of the pursuit. If the pursuit was a substantial factor in bringing about the injury and if the jury believed that it was unwarranted and unlawful under the circumstances, it would have been sufficient as a contributing cause as distinguished from the direct cause. In this conclusion we are not to be understood as negativing the right of the jury to believe the defendant's testimony that he was trying to prevent the plaintiff's circling back to the warehouse as he had done in the past.

IV. It is conceded in the opinion of the chief justice that the evidence of the plaintiff's subsequent actions resulting in aggravating his injuries, namely a second fracture of the arm, would not have been improper had it been pleaded by the defendant. The relevancy of such testimony is referred to by the chief justice being "to affect the extent of damages, or to mitigate the same," because plaintiff in such case rather than the defendant, would have been legally responsible therefor. The appellant's fourth assignment of error does not even raise the point involved in this rule. The appellant simply asserts that evidence of a trespass subsequent to the assault could not be considered either as justification for the prior assault nor in mitigation of compensatory damages. Of course it could not be in justification of the assault and was not offered for that purpose. The reason assigned by appellant why it could not be in mitigation of damages, is that such mitigation can only be sought when punitive damages are asked for. That, however, comes under an entirely different rule which the authorities appear fully to support. The evidence here, however, was offered not for that purpose but simply to show that damage caused by the second break was, or could have been the result of plaintiff's own actions, a purpose which the chief justice concedes to be proper, but only if pleaded.

The appellant does not raise the question of the sufficiency of respondent's answer to justify the introduction of evidence to show that plaintiff's own subsequent acts aggravated his damage (neither he nor his doctor could testify as to what caused the breaking of the cast), and as respondent has had no opportunity to be heard on the point, we are averse to recognizing it as ground for reversal. Section 9385.93, N.C.L.1931–1941 Supp., provides: "The appellant shall, in his opening brief, state his points and such errors as he shall rely on * * *." Section 9385.94 reads: "The supreme court shall not decide any case on any point not raised in the opening brief or briefs in answer thereto without first giving all parties affected an opportunity to be heard upon such point." See Robison v. Mathis, 49 Nev. 35, 234 P. 690; Wittenberg v. Wittenberg, 56 Nev. 442, 55 P.2d 619.